Good morning, Your Honors. Ronald Kaplan appearing for the appellant. P.C. Woo doing business as Megatoys. I'll refer to it as Megatoys. I received the Court's order requesting us to address the Rombey case, and with the Court's permission, I would prefer to address the main issue of the case, kind of get a running start into Rombey, and then discuss Rombey in the context of the entire case. But I will give the Court a sneak preview. I don't believe Rombey is relevant to this case at all. It's a factually distinguishable case in the same way that Hamid is. The main issues here are what constitutes advertising, and more specifically, were Megatoys' activities here advertising? The District Court felt compelled by Hamid, which came out after the briefing was done and just before the Court heard argument on this, the District Court felt compelled by Hamid to rule that Megatoys' activities were not advertising. The Court said at the hearing, and I quote, that prior to the Hamid case, I have been on record as holding that the advertising clause covered this type of claim. But the Hamid case, I think, tied my hands. The Court should not have so found. Hamid did not tie the Court's hands. Hamid was essentially a factually narrow case, and it addressed only the question of whether advertising, and again I quote, can also encompass personal solicitation. It was a personal solicitation case. It did not involve trade shows. It didn't, in fact, Hamid itself said it didn't involve advertising at all. Hamid specifically stated that other than these solicitations, there was no advertising by the beauty salon, Hamid's Beauty Salon. All of the cases cited by Hamid were personal solicitation cases. They didn't cite any trade cases, trade show cases. Our case does not involve any sort of personal solicitation. It involves what I would refer to as real advertising, albeit not the kind of advertising through the media that one often thinks of as advertising to the general public. But it involves real advertising. And therefore, while I think that one can understand why a court might be reluctant to include the kind of personal solicitation, and what I would call, frankly, it's really, Hamid involved taking a competitor's, a former employer's customer list and using it to try to, for lack of a better word, steal the former employer's customers. I can understand why a court would be reluctant to take that kind of activity, call it advertising, and give it coverage under an advertising injury clause of a policy. It must be true, though, that the mere act of selling one's goods is not advertising them, even though in a sense, in the broadest sense of the word, it does. Because if you have a happy customer, that's always a form of advertising. So simply setting up shop and selling things isn't advertising. Would you agree with that? You know, that's a, I'm not sure that we're talking anything other than semantics here. Because if you're talking about just selling out of a store. Let's say I decide to manufacture famous widgets. And I set up a lemonade stand at the corner near my house, and I sell widgets. And there's a little sign that says, you know, widgets, five cents. Is that advertising? Or is that simply having a place where people can come and they know that it's there, and they can come buy it? Is that advertising? I suppose if I were to say yes to that, the court would then ask me, what's the difference between that and a trade show? But the three cases, the only cases, and I'm not trying to skirt the court's question. I think perhaps in the court's very, very narrow factual scenario that the court has set up, I suppose that would be less like advertising than a trade show. But the only three cases that have discussed this question in the context of a trade show have all agreed with our position that it is advertising. Not only have they agreed, but they use words like clearly. It cannot be questioned. They are very certain that trade shows constitute advertising. And one of those cases is the Elcom hardware case, which is a California case. What about if Megatoys simply put a sign outside of a business that had the same copyright issue? Would that be advertising injury? I'm sorry? You put a sign outside your business, put a banner outside your business. You have a street business, you know, a street side business. Would that be advertising to simply put a banner outside your store? If Megatoys sold banners, is that what the court? No, if Megatoys' copyright infringement was reflected on a banner. You know, it's a hard question to answer. There's a, and I use this analogy in my reply brief. There's like a, you can think of this as a continuum or a spectrum. And over here on one end, you've got the Hamid and the Rambe situation where you don't have real advertising. You have taking customer lists, okay, which I think is clearly, clearly not advertising. It's like taking something, a square peg, and trying to fit it into a round advertising hole. Okay. On the other hand, on the other end of the spectrum, you'd have media advertising like Beanie Babies or Cabbage Patch Kids. TV, radio, clearly that is advertising. Okay. The hypotheticals that Your Honors have suggested fall somewhere along that spectrum. Okay. I'm not sure exactly where they fall. Perhaps they fall a little more towards the solicitation than towards the media advertising. But our case is different. Our case is a trade show. Our case to me clearly falls at least halfway and much closer to media advertising because trade shows are the way that many legitimate businesses truly advertise their products. Okay. So let's, I think one of the problems is that we know what a trade show is, but we're trying to figure out does it fit within the contract definition of advertising. So if you look at the contract definition, it has to be a notice broadcast or published to the general public or specific market segment. So what under that definition do you view as the notice that is broadcast to this market segment, that is the people coming to the trade show? It's the mere fact of participating in the trade show. It's the presence of the goods. The presence, it's more than just selling. It's the, somebody comes by a trade show and wants to know what you have and you're setting forth your product. You know, you mentioned at an earlier stage that you had three cases directly on point. You mentioned by name Elcom Hardware, with which I'm familiar. Yes. What are the other two cases? Those others are, there's the Beowulf case in Florida, and the other case is, I believe it's called Fireman's Fund v. Bradley. It's a Wisconsin case. Elcom is the only California case? It's the only California case dealing with trade shows. And it specifically states, and I'll just read a very pithy little one sentence from Elcom, a manufacturer's display and presentation of its products to a significant number of its clients' base, particularly at a site other than the manufacturer's factory or showroom, would be commonly understood, commonly understood to fall within the definition of advertising. I don't know how it could be any plainer. They're talking, and they were talking about a trade show. It's the same as the contractual definition here because everything depends on the contract, and the contract here defines advertisement as a notice, which sounds like a thing rather than an activity. I believe that all of these contractual provisions use the same basic language. I think that the only difference in some of these contractual provisions, for example, between Hamid and Rambeh, between Hamid and this case, is that some of them say widespread dissemination, or not widespread, some of them say to the general public, and some say to the general public or specific market segment. I just went back and checked in Elcom briefly, and it specifies that the contract never defined advertising. So the court fell back on what it thought was advertising. And here we do have a contractual definition. So don't we have to go by what the contract says? Well, actually, yes. If you have a contractual definition, you go by what the contract says. And the contract says that it's, you're focusing on a different word, I think, than all of the cases do, and that's notice. I don't think any of the cases have had any problem with the word notice. I think they all interpret the entire definition to include trade shows. Well, no. How can you say that when we don't know if they're interpreting exactly the same contract provision? I think it's important to focus on notice because I want to know what notice is. I mean, in our heads, I think most people generally would have a notion of what's advertising. It may be too narrow, in fact, based on the contract. So then we go to the, because people think of advertising as promotional materials that are disseminated to the public. That may be too narrow. So you go to the contract and say, well, what, it has to be, a notice has to be broadcast or published. So that was my question to you. Are you saying the notice is simply putting the toys on the table? At a trade show, yes. Okay. Yes. Okay. Counsel, did you want to save you some time for rebuttal? Unless the Court, let me just take a moment, talk about Rambe, because the Court asked us that we be prepared to talk about that. And I guess my feeling about Rambe is it doesn't really, it doesn't apply here. For the same reason that Hamid doesn't apply. It doesn't apply factually. Rambe was just like Hamid in terms of dealing with personal solicitations. It differed from Hamid because in Hamid, because the policy was different. In Rambe, the policy referred to advertising to the general public or to a specific market segment. Therefore, the question of specific market segment was not an issue in Rambe. The only issue in Rambe was whether what the promotional activities were widespread. And they found that a breakfast meeting and an Internet follow-up was not widespread. We don't have that problem here. I mean, I think we clearly meet the outcome definition of widespread, which means it's promoted to a substantial portion of its client base. I don't think that's an issue here. So I see Rambe as basically falling into the Hamid category of being very clearly factually distinguishable. Thank you. Thank you. Mr. Thornton. Good morning, Tim Thornton for Tokyo Marine. Happily. I think that this case, Hamid and Rambe need to be understood in the context of what was going on before in terms of what were insured and insurers arguing about with regard to advertising. And they're basically these three views, the widespread distribution to the public at large view, that was eventually adopted by Hamid. The individual, down to even individual one-on-one solicitations or discussions view that was argued in quite a number of cases and adopted in quite a number of cases. And then sort of an intermediate view, which was sort of the Foxfire approach from the Northern District of California, which talked about what you have to consider, who is the insured, what is their market, and you sort of do an ad hoc analysis of the situation. And Hamid did deal with personal solicitation by telephone with people on a customer list and sending flyers to people on a customer list. This customer list having been taken from by employees from the former employer to the new employer. So actually that is the pattern of it. But what the court holds is much broader than that because they say this is not advertising and then they go on to discuss Foxfire and they say no, this is not something that we can accept. The definition is too malleable and it's going to create a lot of problems. We identify all these policy concerns that we have with that type of ad hoc analysis, which is basically the type of ad hoc analysis that appellant here is trying to reintroduce by saying that this word usually in the quote from Hamid means that you basically go back and do an ad hoc analysis anyway. So what Hamid did is they gave us some examples. They said, what is advertising? It's a TV spot. It's a radio spot. It's an ad in the newspaper. It's a billboard. It's a bus bench board. They gave us those examples. From the fact pattern there, we know that things that are not advertising are sending letters to everyone on your customer list, phoning up everyone on your customer list. And so you do have to figure out which, I guess, analogize which is this case closer to. In this case, the P.C. Wu case is closer to the personal solicitation. Mr. Wu in his declaration filed in support of their motion for summary judgment says we rent space at the trade show, just like you rent space, you rent a store on a street or you rent a store in a mall. We rent space at the trade show. If a customer comes up, then the sales representative will talk to them about features about the product, which is just placed there on a shelf or on a table. They'll talk to them about features that are not readily observable. I guess maybe the quality of the stuffing of the plush doll figures or something like that. So that is basically they've set up a temporary venue where they're going to have these one on one communications with whoever comes up to see. And it's a very narrow set. It's this N.A.D. A.S.D. set of buyers and some sort of middleman, basically some sort of a middle layer of merchandising there. I have a further question about the way the contract works. It also defines advertising injury. And here it's a copyright infringement issue. When the contract talks about advertising injury, does that even cover at all alleged infringement by the underlying goods? Or does it only cover infringement alleged to occur because of the notice? In other words, let's assume in this case there was widespread advertising, except it said, just do it, buy Megatoys. And Nike came along and said, you can't use the phrase, just do it, because that infringes on us, on something that we have used. So what is your view of what the contract covers? Our view is that the contract covers injury that's caused by the advertising and not by the sale of the good that's being advertised. So for instance, you could have a pictorial or a picture element in an advertisement by competitor A. Competitor B could take a very similar picture, basically copying the photographic elements, maybe even copying the photograph itself, something that happens a lot on the Internet now. That's been a copyright infringement that gets incorporated into an advertisement. Okay, but it has to be in the ad and not just the goods. So if I, let's assume in this case that the goods actually do infringe, and that there's widespread advertising, but all it says is, we make nice toys, please buy them. And no pictures, nothing like that. So even there, where there is advertising, it would be your position that there's no advertising injury as defined in the contract. That's correct. In fact, that's one of the points that was discussed in the Rambe case. They were talking about this breakfast meeting where they invited all the temp employees and all the customers to say, hey, we're going out on our own now. And then they discussed a follow-up article in an Internet newspaper. And the court said, conducted that analysis. Well, there was this newspaper article, but nothing in the newspaper article discussed any of the intellectual property that was at issue in the case. So they do conduct that analysis there. It has to be in the advertisement. Well, the question here, though, if you look at what trade shows are, the purpose of them is promotional. And it's promotional to a particular segment. I mean, the toy people show up at these and not the cosmetics manufacturers or retailers or wholesalers. So if the – and I'm sure you've been in your position to a number of these kind of trade shows where basically, you know, booth after booth is promoting products so that they can get to the middlemen so that they can eventually get out to the public. If you look at it in that regard, it's hard to say why this promotional effort wouldn't be advertising. Because it is – the market segment that they're pointed to is, in effect, the middle market. Why isn't that advertising? Well, because the court in Hamed and the court in Rambe are trying to draw a distinction so that there's some ease, certainty of application of the policies, some clarity in interpreting them, and saying that it has to be a widespread distribution. So what goes on in the trade show is not – some of these types of trade shows is not widespread distribution. And really – But let me stop there because, you know, it's one thing to call up a couple customers off a list. But a trade show is to – it's a widespread distribution to that particular market segment, isn't it? I mean, if all the people from that market segment come to the trade show, that's who the trade show is for. It's not a one-on-one proposition. It is a distribution to that – the group of people that come to the trade show. But I don't think it comes within the widespread distribution that the courts are calling for. And the other thing about a trade show that's important – Well, but you have to look at the widespread distribution because that was really not – do we have that language that's tied up with specific market segment, where the court is really interpreting what widespread means when it's directed to a specific market segment as opposed to the public at large? Do you have a case that we could go to other than Hamed that would give us some illumination on that point? Specific market segment – the only case I know of that discusses it is Rambeh. In Hamed, they note that issue and then just reserve judgment on it. Right, and so that's why I was having some difficulty in that Hamed never really gets to the issue we have. Yeah. But see, the other thing is, you know, talking about promoting to everyone that comes to the trade show, if I have a shop in a mall, that's promoting to everyone that comes by the shop, and no one's going to say that's advertising. You know, we have sort of an idea, sort of a plain, ordinary meaning of advertising in our head, and we don't think it means having a shop in a mall or a shop on a street. A booth in a swap meet, for instance, like the Rose Bowl swap meet, we don't think of those things as advertising. Would it be different if you had banners and you were passing out brochures about your product? Would that be advertising? Passing out brochures, I don't think under Hamed that that would do it, because, for instance, in Hamed, they mailed flyers to all of their customers, and the court said, no, that doesn't do it. But it seems to do it under Elcom hardware. I think that Elcom preceded Hamed, and I think that Elcom really is not consistent with what the court says in Hamed and has effectively overruled Subsilentio. That's not these facts anyway. You don't even have to win that point, I would say. Let me ask this, if I might. I think Elcom hardware, even if it is good law in California, really isn't this case, because there was mailing out of brochures, there was stuff on the Internet. I mean, there was traditional advertising in Elcom hardware. Yeah, the catalog issue. And no contractual definition. Different definition, yes. And I confess of the other two cases out of California that are cited, I've read only Beowulf. I've not read Fireman's Claim. If Beowulf were controlling, would you lose? My answer is yes. Yeah, I would, but I think it's not controlling. If you look at the decision, the Florida courts are really proceeding under a different set of rules than California courts do. Well, the reading, as I can look at this, as I look at the contract, it looks like a virtually identical contract. Yeah. So when you say different set of rules, what do you mean? In other words, the rules articulated in Hamed and Rambe as to what advertising means. I see. But they're basically looking at the same contract. The other thing that's different about that, it's different about that case is there was, you know, some more elaborate presentation than just having the product on a shelf. And, you know, what you do. They were at a trade show. People came around and looked at these. There was a cigar or something. A cigar shaped lighters. And they had like a oversized cigar box to show them off. But it sounded like a classic trade show. Yes. And I have not read Fireman's Fund, but the brief description I get out of the brief sounds like Fireman's Fund in Wisconsin. It's basically the same as Bear Wolf. Is that right? Yes, I think so. So what I'm faced with as I look at this is I don't have anything actually directly on point in California. I can I can I can I can hear the arguments on both sides as to how the cases we do have come come at our case and give us suggested answers about anything directly on point. I've got two cases out of California that on their facts are very similar. Bear Wolf, I know, is and I suspect Fireman's Fund when I read it will be. What basis do we have in thinking that California is. Well, I'll say it this way. Are there any out of California trade showcases to go the other way? The only trade showcases that I know of are the three that have already been identified. Your Honor, the three being Bear Wolf, Fireman's Fund versus Bradley and Elkham. Those three cases and Elkham is not relevant to trade showcases. No, no, it's not a trade showcase. I mean, he relies on it because it's kind of the best he can do, but it's not a trade showcase. Now, Elkham is I'm sorry, misunderstood Elkham. They had the brochures and then sort of an additional issue at the end. They talked about demonstrations of the product at a trade show. So, yeah, they did talk about that. Let's take two situations where you just put your products out there to sell. If you have a store in San Francisco and you put the products out to sell, is that advertising? No. And do you see any distinction where the effort is made at a trade show to promote your products so they can get out to be sold? In other words, your form of advertising is not advertising on the Internet, advertising on NBC or that. Your form of advertising is promotion to the people who can actually get it out there so it can be put in a store. Do you think there's some distinction to be made between that and just selling in a store on the streets of San Francisco? Well, they're factually distinct. I think that the I think that they're highly analogous. You know, both as you know, you have you're demonstrating your product, you're putting it out for people to take a look at as they walk by, whether it's in a mall or a store, a swap booth or a trade show. And you really got to focus, I think, on the case. This case really focuses much more precisely on what did they do at the trade show? And all they did was have their product out there. And if you want to come up and talk to them kind of one on one, kind of like a solicitation, they would talk to you about the product. So I think that it's much more analogous to this, just having goods on display for sale in a shop. You know, you can go up and talk to a salesperson and ask them about, you know, what colors do you have, what sizes, etc. What if they had a megaphone and big broadcast system that emanated from their little booth at the trade show? And it had some tagline that was a copyright infringement. Would that qualify as advertising? The. I think that comes back again to what is the California Supreme Court mean by widespread in a maid? And my view is that wouldn't be widespread because it's limited to the what's going on in a trade show. Just like, you know, what if you have an announcement of a blue light special in your Kmart or an announcement in a mall that, you know, there's, you know, a one hour sale down at a boutique. I know what a way to take the specific market segment. Does that mean you advertise in golf magazine as opposed to the newspaper? Generally, that seems product. Yeah, that seems to be what Romney hints at, because the examples they give are like breeders, horse breeders or racing car enthusiasts. Those are the examples they give. But I think focusing on this particular case, I mean, the very easy way to look at it is what did they do with the trade show? And what they did at the trade show is no different than what you would do in any basic shop. You had your goods out for people to walk by, take a look at, ask you questions and maybe buy them. The function of a trade show is really quite different. And the people coming are, you know, I understand the analogy, but it actually works differently as we all understand. And I mean, I do understand that is there are some similarities. I think those are important. There are also differences. I recognize that. Thank you, counsel. Thank you. Mr. Kaplan, I believe you have some rebuttal time remaining. Yes, I don't have enough rebuttal time, but there are two points. Everyone feels that way. There are two points I want to make. The first is regarding Judge Fletcher's statement that Elcom is not a trade show case. I must respectfully disagree. There was a trade show mentioned at the end of a long paragraph of activities. No, it's more than that. And I would call the Court's attention. Unfortunately, I don't have a page cite because my copy of Elcom is the copy that was issued by the Court. But I can refer to the Court to it as the second to last paragraph in Part Roman numeral 4B. It's 218 and 19, I think. Well, if there's a paragraph that begins, in any case, Your Honor is looking at that? Yes. If that is the paragraph. Okay. I'm not there yet. Okay. It's right towards the end. It says in any case. Paragraph 4B. In any case. In any case. All right. That paragraph states that separate and apart from the brochure, forget the brochure, even if the brochure doesn't count, separate and apart from the brochure, the trade show standing by itself constitutes advertising. That's what it said. I got you. It is a trade show case. I missed that part, but okay. The other point I wanted to make, because the Court seems to be concerned with the word notice, which, frankly, I think until now, I don't think anybody paid attention to that word. It wasn't briefed before the district court. I just don't believe that that was really part of the case. I'm certainly willing. But it's part of the contract. Well, that's one of the points I wanted to make. There's two points. First of all, I'd be happy to submit supplemental briefing, but I do want to call the Court's attention that I'm really not sure that it's part of the contract. And here is why. There are three contracts that were, three insurance contracts in this case, one after the other. And it's a little bit unclear, but it appears to me that the applicable insurance policy in this case is the first one that was issued. And I will explain to the Court, if the Court wants, why I think that. But I think it is the first one that was issued that's the applicable policy. And that one does not define advertising. The latter two do. So if, in fact, the first one is the one that's applicable, then the question of notice doesn't come up. Is the first, is this a claims made? It appears, it appears to me, and again, I don't think anybody ever paid much attention to this, because they simply stipulated the three policies. Nobody ever talked about which one applies. I believe that the policies indicate that it's when the act that gave rise to the injury occurred. The act occurred at the trade show. And the trade show was during the policy period of the first policy. Okay. Thank you, counsel. I think that that would avoid the whole question of notice. But if the Court thinks that notice is important, I would be more than happy to submit supplemental briefing on that subject. We understand your position. Thank you very much.  Thank you very much. The case just argued is submitted.
judges: Graber, McKeown, W. Fletcher